IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01463-JLK-MDB

SCHOOL DISTRICT 49, et al.,

Plaintiffs,

v.

AUBREY SULLIVAN, in her official capacity as Director of the Colorado Civil Rights Division, et al.,

Defendants.

**STATE DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

Defendants Aubrey Sullivan, the Director of the Colorado Civil Rights Division, the members of the Colorado Civil Rights Commission, and Philip Weiser, the Attorney General of Colorado (collectively, "the State Defendants") hereby move, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), to dismiss all claims in this matter.

## **INTRODUCTION**

Each of the plaintiff local education providers (collectively, "the Plaintiffs" or "the LEPs") recently adopted policies that would exclude transgender students from participating on sports teams consistent with their gender identity. Fearing their new policies may conflict with the Colorado Anti-Discrimination Act[1] ("CADA")—which prohibits "educational institutions" from discriminating against students based on their gender identity, *see* C.R.S. § 24-34-601(2)(a)—Plaintiffs filed this lawsuit seeking to preemptively enjoin CADA's enforcement based on allegations that the law violates the Fourteenth Amendment. However, the Amended

---

[1] Codified at Colo. Rev. Stat. ("C.R.S.") §§ 24-34-300.5 through -806.

1

Complaint does not allege that Plaintiffs have any transgender student athletes, that they have ever applied their new transgender exclusion policies to anyone, or that they have been threatened with any sort of CADA enforcement action. These pleading deficiencies are fatal to Plaintiffs' claims, as their purely hypothetical fears of CADA enforcement do not establish an actual or imminent injury in fact. That, alone, warrants dismissal under Rule 12(b)(1), because Plaintiffs lack Article III standing.

Plaintiffs' claims also fail for additional, independent reasons. First, as to the Attorney General, Eleventh Amendment sovereign immunity shields him from suit because the Amended Complaint wholly fails to allege that the Attorney General has a particular duty to enforce CADA and has shown a demonstrated willingness to do so. Second, Plaintiffs have failed to satisfy the prudential standing doctrine because political subdivisions do not have a Fourteenth Amendment cause of action against their parent states (Claims 1 and 2). And finally, Plaintiffs have failed to establish third-party standing to assert claims on behalf of their students (Claims 3 and 4). Consequently, all claims against the State Defendants must be dismissed.

## FACTS

Plaintiffs filed this lawsuit seeking to enjoin Director Sullivan, the Colorado Civil Rights Commission ("the Commission"), and the Attorney General from enforcing CADA's protections for transgender students.

### I. The Colorado Anti-Discrimination Act

"Gender identity" is defined as "an individual's innate sense of the individual's own gender, which may or may not correspond with the individual's sex assigned at birth." C.R.S. § 24-34-301(10). For cisgender students, their gender identity matches their sex assigned at birth; for transgender students, it does not. Under CADA, places of public accommodation—including "educational institutions" such as Plaintiffs—are prohibited from denying to an individual or

2

group, because of their sex, gender identity, or gender expression, "the full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations." C.R.S. § 24-34-601(2)(a). Local education providers thus cannot deny transgender students the full and equal enjoyment of the educational programming, including any extracurricular athletic opportunities, that may be offered. *See Tesmer v. Colorado High Sch. Activities Ass'n*, 140 P.3d 249 (Colo. App. 2006) (recognizing CADA's applicability to high school athletics).

Through regulation, the Colorado Civil Rights Division ("the Division") has clarified that "[n]othing in [CADA] prohibits segregation of facilities on the basis of gender." 3 Colo. Code Regs. ("CCR") 708-1, Rule 81.9(A). However, places of public accommodation that use gender-segregated facilities, such as "restrooms, locker rooms, dressing rooms, and dormitories," are required to permit individuals to use the facilities "that are consistent with their gender identity." *Id.* Rule 81.9(B). But if a particular gender-segregated facility is one "where undressing in the presence of others occurs," then covered entities need only "make reasonable accommodations to allow access consistent with an individual's gender identity." *Id.* Rule 81.9(C).

Persons aggrieved by a discriminatory or unfair practice may file a charge alleging a violation of CADA with the Division, which investigates such complaints and determines whether probable cause exists to support the charge. C.R.S. § 24-34-306(1)-(2). If the Division finds probable cause, and a period of mediation fails, the matter is reported to the Commission, which may convene a formal hearing. *Id.* -306(4). CADA also authorizes the Commission, a commissioner, or the Attorney General to file a charge with the Division when an alleged discriminatory practice "imposes a significant societal or community impact." *Id.* -306(1)(b). Lastly, in addition to CADA's procedures, Colorado has also established a school- and district-level complaint process for students experiencing discrimination or harassment on the basis of protected classes. C.R.S. § 22-1-143.

II.     **Plaintiffs' Transgender Exclusion Policies**

School District 49 recently adopted a policy that classifies K-12 sports teams by sex assigned at birth. *See* Am. Compl. ¶ 39, ECF No. 35. This policy "prohibits biological males from competing on girls' teams and prohibits biological females from competing on boys' teams." *Id.* ¶ 40. The prohibitions of District 49's policy also extend to locker rooms and hotel rooms. *Id.* ¶ 41. The practical effect of this policy is to categorically ban transgender student athletes from participating in the sporting events aligned with their gender identity, because allowing such participation is, according to District 49, "demeaning, unfair, and dangerous to women and girls." *Id.* ¶ 43(a)(6). Shortly after the adoption of this transgender sports ban, the other seven Plaintiffs adopted policies that are substantially similar (and in some cases, even identical) to that of District 49. *Id.* ¶ 44.

Plaintiffs' claims are based on a perceived conflict between their new policies and CADA. In the Amended Complaint, Plaintiffs assert four causes of action under 42 U.S.C. § 1983. The first two claims allege Fourteenth Amendment violations on behalf of the LEPs themselves, arguing, respectively, that CADA discriminates on the basis of sex and violates bodily privacy. Am. Compl. ¶¶ 118-143. The last two claims allege identical violations on behalf of Plaintiffs' students. *Id.* ¶¶ 144-161. Notably absent from the Amended Complaint are any allegations explaining how Plaintiffs' policies will be applied in practice. Plaintiffs have not alleged that they have any students that identify as transgender, much less that they have any such students who wish to participate in athletics. In fact, when the local board for District 49 adopted the policy at issue, Board Member Mike Heil stated on the record that "There are no known trans athletes in D49." Sch. Dist. 49 Bd. of Educ., *Hearing on Action Item 7.5: Proposed*

4

*Policy JBA – Preserving Fairness and Safety in Sports*, at 2:10:18 (May 8, 2025).[2] Relatedly, Plaintiffs have not alleged that they have applied their new exclusion policies to any specific transgender students. Nor have Plaintiffs alleged any CADA enforcement action, threat of CADA enforcement action, or even any complaints against them for their policies or practices regarding transgender students. Nevertheless, Plaintiffs ask this Court to declare CADA unconstitutional and permanently enjoin the State Defendants from enforcing CADA in a manner that might someday conflict with their new policies. *Id.*, Prayer for Relief.

## LEGAL STANDARDS

Rule 12(b)(1) permits the court to dismiss a complaint when it lacks subject-matter jurisdiction over the action. Fed. R. Civ. P. 12(b)(1). The party asserting federal jurisdiction bears the burden of establishing that jurisdiction exists. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017). Rule 12(b)(6) permits the dismissal of a complaint which "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

**I.   Eleventh Amendment sovereign immunity bars Plaintiffs' claims against the Attorney General.**

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205

---

[2] Available at: https://www.youtube.com/watch?v=AQK_fHEsT9o. Insofar as Board Member Heil's comment is an easily verifiable matter of the Plaintiff's public administrative record, the Court may take judicial notice of the comment without converting this motion to dismiss to one for summary judgment. *Wyo-Ben Inc. v. Haaland*, 63 F.4th 857, 863 (10th Cir. 2023). And since this is a statement of a party-opponent, the Court may consider the statement for its truth. *See* Fed. R. Evid. 801(d)(2) (excluding opposing party statements from the rule against hearsay).

(10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)). State officials sued in their official capacities are immune because they are "an arm of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977), and "such suits are no different from a suit against the State itself," *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quotations omitted). The only potentially applicable exception to this immunity—*Ex parte Young*, 209 U.S. 123 (1908)—does not apply here.

Under *Ex parte Young*, in certain circumstances, a plaintiff may seek prospective relief against a state official to enjoin alleged ongoing violations of federal law. *Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024). But it is a "narrow exception." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). To come within the *Ex parte Young* exception, the state official whom a plaintiff seeks to enjoin must have (1) "a particular duty to enforce" the challenged statute and (2) "a demonstrated willingness to exercise that duty." *Free Speech Coal.*, 119 F.4th at 736 (citations omitted). And "when a state law explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official *absent some evidence* that the defendant is connected to the enforcement of the challenged law." *Peterson*, 707 F.3d at 1207 (emphasis added).

An official's enforcement authority is critical to the exception. The theory behind the *Ex parte Young* exception is that "if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in sovereign immunity." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (O'Connor, J., concurring). Where a state official enjoys enforcement authority, a federal court can, in effect, prospectively inform the official that if the official takes enforcement action, they will be acting in excess of their authority and no longer enjoy immunity. Otherwise, the

6

lawsuit "is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. Neither element of the *Ex parte Young* test is met here.

First, the Attorney General has no "particular duty" to enforce CADA. Plaintiffs point to C.R.S. § 24-34-306 for the Attorney General's enforcement authority, Am. Compl. ¶ 33, but under that statute, the Attorney General has neither an affirmative duty to act, nor the independent power to enforce CADA related to public accommodations. CADA is generally enforced by the Division and the Commission, upon the filing of a charge by an aggrieved individual. Under C.R.S. § 24-34-306(1)(b), the Attorney General *may* file a discrimination charge with the Division—and only after he determines that any alleged discriminatory practice "imposes a significant societal or community impact." If the Attorney General files a charge, he does so "in the same manner" as an individual complainant, *id.*, which is to say the Division—not the Attorney General—investigates and has discretion to make a probable cause finding about the Attorney General's charge, and the Commission—not the Attorney General—has the sole authority to enforce CADA at a hearing.

In other cases, the Tenth Circuit has held that a state attorney general is entitled to sovereign immunity where he was not required to sue on behalf of a victim of discrimination, *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010), or where an independent board was authorized to enforce a challenged law, *Hendrickson*, 992 F.3d at 967. Although those cases did not involve permissive power to file a complaint with an enforcement authority, they nonetheless support the conclusion that the Attorney General's authority as an individual complainant to an independent enforcement body falls short of having a "particular duty" to enforce. *See Edmondson*, 594 F.3d at 760 (holding that the Oklahoma attorney general was entitled to sovereign immunity for challenge to a statute designating certain

7

conduct as discriminatory, because he lacked authority to prosecute that kind of discriminatory practice and the statute placed enforcement authority in human-rights commission); *Hendrickson*, 992 F.3d at 967 (holding that the New Mexico attorney general was entitled to sovereign immunity where challenged law empowered the independent Public Employee Labor Relations Board—not the attorney general—to enforce state's exclusive representation law). Analogously, here the Division and the Commission carry out enforcement; the Attorney General lacks independent authority to enforce CADA.

Though one district court has held that the Attorney General has a duty to enforce CADA because lawyers in the Attorney's General office represent the Commission in administrative enforcement actions, *see Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1253 (D. Colo. 2019), this Court should decline to follow that case. *See Doe v. Univ. of Colorado, Boulder through Bd. of Regents of Univ. of Colorado*, 255 F. Supp. 3d 1064, 1085 (D. Colo. 2017) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). When lawyers employed by the Attorney General's Office represent the Commission, they serve as its agents and act in furtherance of its goals and interests. In that scenario, the Attorney General acts with no independent or discretionary enforcement authority that need be enjoined. *See* Colo. RPC 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation[.]").[3] Rather, the Commission, as the client, directs the enforcement action. *See* C.R.S. § 24-34-306(4) (the Commission "shall issue" notice and complaint). In fact, when lawyers from the Attorney

---

[3] This argument applies with equal force to the recent decision in *Bella Health and Wellness et al. v. Weiser et al.*, construing the Attorney General's role in enforcing the Colorado Medical Practices Act. 23-CV-0939-DDD-SBP, Order on Motions for Summary Judgment, Doc. 224 at 22 (D. Colo. entered Aug. 1, 2025).

8

General's office represent a state agency client, they do so out of a general statutory obligation found elsewhere in statute and rule. *See* C.R.S. § 24-31-101(1)(a) (the Attorney General "[s]hall act as the chief legal representative of the state and be the legal counsel and advisor of each department, division, office, board, commission, bureau, and agency of state government"). Applying the *Ex parte Young* exception based on the Attorney General's office's role in representing the Commission would amount to finding the generalized role of the Attorney General as legal counsel for state entities constituted a particular duty to enforce. Such general legal duties have repeatedly been deemed insufficient to draw the Attorney General into *Ex parte Young*'s exception to sovereign immunity. *See, e.g.*, *Free Speech Coal.*, 119 F.4th at 739; *Edmondson*, 594 F.3d at 760.

Nor does the Tenth Circuit's decision in *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021), suggest that *Ex parte Young* applies. There, the Tenth Circuit described Colorado as having "conceded" that the Attorney General has "limited enforcement authority" under CADA in addressing traceability for purposes of the plaintiff's standing. *Id.* at 1175. But that is not an identical question to whether the Attorney General has a "particular duty to enforce" for purposes of sovereign immunity. And to put a finer point on it, Colorado does *not* concede here that the Attorney General has limited authority to enforce CADA and instead contends that he may, but not must, file a charge of discrimination for investigation by the Division and potential prosecution by the Commission just like any other complainant. *See* § 24-34-306(1)(b).

Next, Plaintiffs allege no facts showing the Attorney General has ever exhibited a "demonstrated willingness" to exercise his limited, permissive authority to serve as a complainant under C.R.S. § 24-34-306(1)(b). Plaintiffs have not identified *any* instance in which a Colorado Attorney General has ever filed a charge with the Division, let alone a complaint against a school district or one related to extracurricular activities. Similarly, Plaintiffs fail to

9

allege any plausible facts establishing that the Attorney General has any future intent to file a charge with the Division.

Given that the Attorney General lacks a particular duty to enforce CADA and Plaintiffs have failed to provide some evidence that the Attorney General has a demonstrated willingness to exercise even his limited discretion to serve as a complainant, suit against him is barred by sovereign immunity.

### II. Plaintiffs lack Article III standing to assert any of their four claims because they have not suffered an injury in fact to a legally protected interest.

This matter must be dismissed against State Defendants pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs have failed to establish Article III standing. Standing to sue in federal court requires plaintiffs to establish three elements: injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy the first element, plaintiffs must plead an injury in fact to a legally protected interest that is "actual or imminent, not conjectural or hypothetical." *Id*. at 560. For a pre-enforcement challenge such as this, "[t]he threatened injury must be *certainly impending* and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (emphasis added). This requires plaintiffs to show (1) an intention to engage in conduct proscribed by the challenged statute, and (2) a credible threat that the challenged statute will be enforced against them. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Plaintiffs have failed to articulate an injury in fact because the harms they allege are wholly "conjectural or hypothetical." Although Plaintiffs would like an advisory opinion declaring their new policies lawful, they have alleged no facts whatsoever showing a "certainly impending" injury because CADA enforcement cannot be based on mere speculation about a school's abstract policy—it requires an actual complainant, and here, there is none. *See* C.R.S. §

10

24-34-306. Plaintiffs have not alleged that a transgender student has or will file a CADA complaint against them, nor are there allegations that any of the State Defendants have investigated, prosecuted, penalized, or otherwise threatened any of the Plaintiffs because of their new policies. In fact, Plaintiffs have not even applied their new policies to anyone. And it may be the case that they never apply these policies because they do not claim to have *any* transgender students at all (or even explain how they intend to identify such students), much less a transgender student who wants to play sports.

Plaintiffs' fears of future CADA enforcement actions are based entirely on a *hypothetical* transgender student who *might* disclose their transgender status, *might* want to play sports on a team aligned to their gender identity, and *might* file a CADA complaint *if* they are ultimately denied the opportunity to play. The Amended Complaint thus fails to establish that Plaintiffs have an intent to actually violate CADA in the foreseeable future, and it also fails to show a credible threat of CADA enforcement. The series of uncertain events that must occur before Plaintiffs may someday apply their policies and may someday face CADA enforcement is far too speculative to confer Article III standing. *See Lujan*, 504 U.S. at 564 ("'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (emphasis in original)). Further, when a theory of standing relies on "speculat[ions] about the decisions of third parties," as this one does, it must fail. *Murthy v. Missouri*, 603 U.S. 43, 72 (2024). The allegations in this case are not based on any imminent threat of actual harm; rather, they are simply a reflection of Plaintiffs' "desire to vindicate value interests," which is insufficient for Article III standing. *Diamond v. Charles*, 476 U.S. 54, 66 (1986). Without Article III standing to bring any of their claims, Plaintiffs cannot establish subject matter jurisdiction, so this case must be dismissed under Rule 12(b)(1).

### III. Each of Plaintiffs' four claims violates prudential standing principles.

All four causes of action in the Amended Complaint should also be dismissed for the independent reason that they fail prudential standing. Specifically, the Plaintiffs cannot establish political subdivision standing to bring Claims 1 and 2, nor can they establish third-party standing to bring Claims 3 and 4.

### A. Claims 1 and 2 must be dismissed because political subdivisions cannot challenge statutes of their parent state on Fourteenth Amendment grounds.

Claims 1 and 2 in the Amended Complaint allege that CADA violates the Fourteenth Amendment rights of the Plaintiff LEPs themselves. However, local education providers cannot assert such claims against their parent state, which means the first two causes of action must be dismissed under Rule 12(b)(6). *See Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021) (en banc) (holding that the analysis of political subdivision standing "go[es] to the merits of the case, not the court's jurisdiction.").

When a suit is filed "against a state official in his or her official capacity . . . it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). In *Branson Sch. Dist. RE-82 v. Romer*, the Tenth Circuit held that "a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment." 161 F.3d 619, 628 (10th Cir. 1998). *See also City of Moore, Okla. v. Atchison, Topeka, & Santa Fe Ry. Co.* 699 F.2d 507, 511-12 (10th Cir. 1983) ("political subdivisions of a state lack standing to challenge the validity of a state statute on Fourteenth Amendment grounds."). Here, Claims 1 and 2 rely on the Fourteenth Amendment's Equal Protection and Due Process Clauses, respectively. And in Colorado, local education providers, such as Plaintiffs, "owe their existence as a political subdivision to the state." *Romer*, 161 F.3d at 629. Insofar as Plaintiffs are each political subdivisions of the State of Colorado, none of them

have a cause of action to sue the State Defendants for alleged Fourteenth Amendment violations. Plaintiffs thus have not—and indeed cannot—state a claim for relief.

### B. Claims 3 and 4 must be dismissed because Plaintiffs lack third-party standing to assert alleged violations of their students' rights.

Plaintiffs have failed to establish third-party standing to bring Claims 3 and 4 on behalf of their students, and thus cannot overcome the longstanding rule that a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

In limited circumstances, third-party standing may be permissible if a litigant can show that it satisfies the requirements of Article III standing *and* that (1) it has a "'close' relationship" with the person who possesses the right, and (2) there is a "'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Whether third-party standing is properly analyzed under the framework of Rule 12(b)(1) or Rule 12(b)(6) remains unsettled in the Tenth Circuit. *See VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017) (assuming, without deciding, that a lack of third-party standing warrants dismissal under Rule 12(b)(6)).[4] Regardless, Plaintiffs' allegations do not satisfy either element of the two-pronged test for third-party standing; this is true despite the "deferential manner" in which that test is applied to cases, such as this, where enforcement of the challenged statute would allegedly result in the violation of a third party's rights. *Aid for Women v. Foulston*, 441 F.3d 1101, 1112 (10th Cir. 2006).

---

[4] Courts generally decline to adjudicate the rights of third parties because "it may be that in fact the holders of those rights . . . do not wish to assert them . . . ." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). This, in turn, means there is no "controversy" for Article III standing, because there is no "genuine, live dispute between adverse parties." *Carney v. Adams*, 592 U.S. 53, 58 (2020). Thus, Plaintiffs' lack of third-party standing should arguably be analyzed under Rule 12(b)(1).

13

As to the first element, a "close" relationship for third-party standing is one where the litigant "is fully, or very nearly, as effective a proponent of the right" as the third party. *Singleton*, 428 U.S. at 115. Common examples of such relationships include lawyer and client, *see U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720-21 (1990), or doctor and patient, *see Foulston*, 441 F.3d at 1111-15. In some circumstances, "teachers may have a sufficiently close relationship to their students to satisfy the first prong of the test for third party standing." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208 (6th Cir. 2011). But even if a particular relationship might ordinarily be close enough, courts have recognized that third-party standing is nevertheless inappropriate if there is a potential conflict of interest between the litigant and the possessor of the right at issue. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (holding that a father lacked third-party standing to assert the rights of his child because "the interests of this parent and this child are not parallel and, indeed, are potentially in conflict.") (*abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

Here, Plaintiffs have not alleged that they have any transgender students (which, itself, is fatal to their case—*see* Section II, *supra*). But if Plaintiffs do in fact have transgender students, the interests of such students may be adverse to Plaintiffs' position in this litigation, because the relief sought from this suit would potentially limit their rights under CADA. *See* Am. Compl. ¶ 12 (requesting an injunction against CADA's protections for transgender students). Plaintiffs cannot represent their student bodies in this matter if doing so detrimentally impacts some of their students because such a conflict precludes third-party standing.

Regarding the second element of third-party standing, Plaintiffs have not shown that their students are somehow inhibited from representing themselves. *See Singleton*, 428 U.S. at 115-16 ("Even where the relationship is close, the reasons for requiring persons to assert their own rights

14

will generally still apply."). There are no allegations of *any* obstacle preventing Plaintiffs' students from asserting their own rights. On the contrary, Colorado law requires that all public schools have a process to accept and investigate students' complaints of discrimination and harassment. C.R.S. § 22-1-143. Students also can and occasionally do file legal challenges to transgender-inclusive sports policies on their own. *See, e.g.*, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34 (2d Cir. 2023); *Slusser v. Mountain West Conf.*, 2024 WL 4876221 (D. Colo., Nov. 25, 2024). Therefore, Plaintiffs cannot avail themselves of third-party standing, which means Claims 3 and 4 must be dismissed.

## CONCLUSION

Plaintiffs have asked this Court to strike down Colorado's statutory protections for transgender students, based on pure speculation that schools might someday be penalized for banning hypothetical transgender student athletes. However, due to Plaintiffs' numerous incurable pleading deficiencies, this case must be dismissed, without leave to amend, pursuant to Rules 12(b)(1) and (b)(6).

Dated August 8, 2025.

| | |
|---|---|
| */s/ Lane Towery* | */s/ M. Blake McCracken* |
| TALIA KRAEMER | NORA Q.E. PASSAMANECK |
| Senior Assistant Attorney General | Senior Assistant Attorney General |
| LANE TOWERY | M. BLAKE MCCRACKEN |
| Assistant Attorney General | Assistant Attorney General |
| 1300 Broadway, 6th Floor | DOMINICK D. SCHUMACHER |
| Denver, CO 80203 | Assistant Attorney General |
| (720) 508-6000 | 1300 Broadway, 6th Floor |
| Talia.Kraemer@coag.gov | Denver, CO 80203 |
| Lane.Towery@coag.gov | (720) 508-6000 |
| *Attorneys for Defendant Philip Weiser, in his official capacity as the Attorney General of the State of Colorado* | Nora.Passamaneck@coag.gov |
| | Blake.McCracken@coag.gov |
| | Dominick.Schumacher@coag.gov |
| | *Attorneys for Defendant Members of the Colorado Civil Rights Commission, and Defendant Director of the Colorado Civil Rights Division* |

CERTIFICATE OF SERVICE

This is to certify that I have served the foregoing **STATE DEFENDANTS' JOINT MOTION TO DISMISS COMPLAINT** upon all parties using the court's CM/ECF filing system, this 8th day of August, 2025.

_/s/Dave Sluss_