IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 25–cv–01463–JLK–MDB

SCHOOL DISTRICT 49,
MONUMENT ACADEMY,
EDUCATION REENVISIONED BOCES,
ACADEMY SCHOOL DISTRICT 20,
JAMES IRWIN CHARTER SCHOOLS,
MONTEZUMA CORTEZ SCHOOL DISTRICT,
THE CLASSICAL ACADEMY, and
COLORADO SPRINGS SCHOOL DISTRICT 11,

    Plaintiffs,

v.

AUBREY SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity,
SERGIO RAUDEL CORDOVA, as member of the Colorado Civil Rights Division, in his official capacity,
GETA ASFAW, as member of the Colorado Civil Rights Division, in her official capacity,
MAYUKO FIEWEGER, as member of the Colorado Civil Rights Division, in her official capacity,
DANIEL S. WARD, as member of the Colorado Civil Rights Division, in his official capacity,
JADE ROSE KELLY, as member of the Colorado Civil Rights Division, in her official capacity,
ERIC ARTIS, as member of the Colorado Civil Rights Division, in his official capacity, and
PHILLIP WEISER, Colorado Attorney General, in his official capacity,

    Defendants.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Maritza Dominguez Braswell**

This matter is before the Court on the State Defendants'[1] Joint Motion to Dismiss the Amended Complaint (["Motion"], Doc. No. 36).[2] Plaintiffs responded in opposition (Doc. No. 46) and the State Defendants replied in support (Doc. No. 49). Additionally, the Court heard oral argument on the Motion on December 8, 2025. (Doc. No. 53) After considering the Motion, briefing, oral argument, and relevant law, the Court respectfully **RECOMMENDS** that the Motion be **GRANTED**.

## STATEMENT OF THE CASE

Plaintiffs are a collection of school districts and charter schools (collectively, "Plaintiffs" or the "School Districts") that, during the spring and summer of 2025, "adopted policies classifying sports teams by biological sex and maintaining separate locker rooms and accommodations."[3] (Doc. No. 35 at ¶¶ 9, 39–50; *see id.* at ¶¶ 40–41 (saying District 49's policy "prohibits biological males from competing on girls' teams and prohibits biological females from competing on boys' teams" and "forbids boys from sharing locker or hotel rooms with girls and prohibits girls from sharing locker or hotel rooms with boys"); *see also id.* at ¶ 43 (reproducing

---

[1] The State Defendants are the Director of the Colorado Civil Rights Division, Aubrey Sullivan, the members of the Colorado Civil Rights Commission, Sergio Raudel Cordova, Geta Asfaw, Mayuko Fieweger, Daniel S. Ward, Jade Rose Kelly, and Eric Artis, and the Attorney General of Colorado, Philip Weiser. (*See* Doc. No. 36.)

[2] The Colorado High School Activities Association ("CHSAA") Defendants also filed a motion to dismiss the claims against them. (Doc. No. 37.) However, on December 2, 2025, Plaintiffs notified the Court that they reached a settlement with the CHSAA Defendants, and on January 13, 2026, the CHSAA Defendants were dismissed from the case. (Doc. Nos. 51; 58.) Accordingly, the CHSAA motion to dismiss is moot and the Court will not address it here.

[3] According to the School Districts, District 49 was the first to adopt such a policy and the other Plaintiffs "adopted materially identical policies." (Doc. No. 35 at ¶ 44.)

the entirety of District 49's policy); *id.* at ¶¶ 51–73 (describing the rationale behind the policies).)

However, according to the School Districts, the Colorado Anti-Discrimination Act ("CADA"), "as interpreted and applied" by the State Defendants, bars them from enforcing their new policies without facing "serious costs and sanctions." (*Id.* at ¶¶ 85, 93–94.) Specifically, Plaintiffs allege that the relevant portion of CADA, "as interpreted by the Defendants in 3 Colo. Code Regs. § 708-1:81.9," requires them to allow individuals to use gender segregated facilities (e.g., locker rooms) in a manner "consistent with their gender identity." (*Id.* at ¶ 88.) Further, the School Districts say the State Defendants require them to "allow males who identify as girls to play on girls' sports teams." (*Id.* at ¶ 89.)

In short, Plaintiffs allege that CADA—and by extension the State Defendants—are preventing the School Districts from enforcing segregation policies that are based on biological sex. Plaintiffs *do not* allege that they have been subjected to any enforcement action. (*See generally* Doc. No. 35.) Nevertheless, Plaintiffs say they have a "credible fear" of future enforcement. (*Id.* at ¶ 111.)

Plaintiffs bring Fourteenth Amendment sex-discrimination claims under the Equal Protection Clause (Claims 1 and 3) as well as claims for violation of the right to bodily privacy and safety (Claims 2 and 4). (Doc. No. 35 at ¶¶ 110–161.) Claims 1 and 2 are brought by Plaintiffs on their own behalf; Claims 3 and 4 are brought by Plaintiffs on behalf of their

3

students.[4] (*Id.*) The State Defendants are sued in their official capacities only. (*Id.* at ¶¶ 21–22, 31–33.) Plaintiffs seek a declaration that CADA and its implementing regulations:

> do not require the Plaintiffs to allow boys to play on girls athletic teams, girls to play on boys athletic teams, to open private spaces open to athletes of one sex to members of the opposite, or to house members of the opposite sex in travel accommodations for school sports because ... such an interpretation of CADA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(*Id.* at 31.) They also seek a permanent injunction that would preclude Defendants from enforcing CADA against them in a way that would require the School Districts to allow cross-sex sports participation and locker room use. (*Id.* at 31–32.)

The State Defendants argue that Plaintiffs lack prudential standing because they cannot maintain Fourteenth Amendment claims against their parent state, and because they cannot maintain third party claims on behalf of their students.[5] (*Id.* at 12–15.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6),[6] a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling

---

[4] Certain phrasing in the Amended Complaint suggests Claims 3 and 4 are only brought on behalf of District 49's students. (*See* Doc. No. 35 at 28, 30.) However, during the Motion Hearing, Plaintiffs' counsel confirmed this was a scrivener's error, as Claims 3 and 4 are brought on behalf of students in all of Plaintiffs' districts or schools.

[5] The State Defendants also argue that Attorney General Weiser has Eleventh Amendment immunity, (Doc. No. 36 at 5–10), and that Plaintiffs lack Article III standing, (*id.* at 10–11). However, as noted below, the Court finds it need not reach those arguments.

[6] In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court acknowledged that at least some of the principles historically encompassed by the "prudential standing" doctrine are not really issues of "standing" at all. *See id.* at 127 (describing "prudential standing" as a "misnomer" under certain contexts). Thus, prudential standing arguments are not always considered under Federal Rule of Civil Procedure 12(b)(1). *See Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021) ("Following *Lexmark*, we now have greater clarity

on such a motion, a court accepts all well-pleaded facts as true and views the allegations in the light most favorable to the plaintiff. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010). However, the plaintiff bears the burden of presenting a complaint with enough factual details to suggest entitlement to relief. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Indeed, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). Ultimately, courts assess "whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

The Court begins its analysis with prudential standing.

---

about which issues anachronistically labeled as 'standing' are actually jurisdictional[.]"). The appropriate legal standard turns on the specific argument being made. As to the arguments at issue here—namely that Plaintiffs cannot bring Fourteenth Amendment claims against their parent states and that Plaintiffs may not bring these claims on behalf of their students—the Tenth Circuit treats these as "merits" arguments that may be appropriately considered under Rule 12(b)(6). *See Kerr*, 20 F.4th at 696 ("[W]hat we formerly referred to as political subdivision standing is an inquiry going to the merits of the case, not the court's jurisdiction. Under this inquiry, we no longer ask whether a political subdivision has standing. We ask whether the political subdivision has a cause of action."); *The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162 n.1 (10th Cir. 2011) (stating that issues of third-party standing are "not a jurisdictional limitation"). Moreover, courts in this District have generally defined prudential standing arguments as "merits" arguments to be considered under Rule 12(b)(6). *See Hernandez v. United Builders Serv., Inc.*, 2019 WL 4744788, at *4 (D. Colo. Sept. 30, 2019) ("Standing which is *truly* 'prudential'—and not jurisdictional—is subject to dismissal under Rule 12(b)(6)." (footnote omitted) (emphasis in original)); *see also Bruce v. City of Colorado Springs*, 2022 WL 16702252, at *13 (D. Colo. Sept. 27, 2022) (noting that when a plaintiff is not "assert[ing] his own legal rights … dismissal under Rule 12(b)(6) is likely the appropriate route."), *aff'd*, 2024 WL 1109065 (10th Cir. Mar. 14, 2024). Thus, the Court proceeds under Rule 12(b)(6).

Prudential standing represents "judicially self-imposed limits on the exercise of federal jurisdiction" that are "founded in concern about the proper—and properly limited—role of the courts in a democratic society[.]" *Bennett v. Spear*, 520 U.S. 154, 162, (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[A] party's interest for the purposes of constitutional standing does not automatically confer prudential standing." *The Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1171 (10th Cir. 2011). "In other words, a party may have constitutional standing but still not satisfy prudential standing." *Hernandez v. United Builders Serv., Inc.*, 2019 WL 4744788, at *4 (D. Colo. Sept. 30, 2019). "Although a court has the independent duty to verify that a party has Article III standing, where a party lacks prudential standing, a court may proceed directly to that issue without deciding whether plaintiff has constitutional standing." *Id.* (citing *VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1147 n.3 (10th Cir. 2017)); *see also Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) (saying "the prudential standing doctrine, represents the sort of 'threshold question' we have recognized may be resolved before addressing jurisdiction"). Likewise, the Court may move to the prudential standing arguments without deciding whether the Attorney General has Eleventh Amendment immunity. *See Hill v. Warsewa*, 947 F.3d 1305, 1308 (10th Cir. 2020) (finding the district court did not err by analyzing prudential standing before sovereign immunity). In that sense, and because the Court finds Plaintiffs lack prudential standing, the Court's analysis not only begins with prudential standing, but ends there as well.

A prudential standing analysis has historically implicated three broad principles—"the general prohibition on a litigant's raising another person's legal rights, the rule barring

6

adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 126. Generally-speaking, the question that needs to be answered through a prudential standing analysis "is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500.

Here, the State Defendants raise two prudential standing arguments. First, they argue Claims 1 and 2 must be dismissed because "political subdivisions cannot challenge state statues of their parent state on Fourteenth Amendment grounds." (Doc. No. 36 at 12–13.) Second, they argue Plaintiffs have failed to establish third-party standing on behalf of their students in Claims 3 and 4. The Court addresses each argument in turn.

I.      **Plaintiffs' Fourteenth Amendment Claims Against their Parent State**

Under Tenth Circuit precedent, a political subdivision's claim against its parent state "cannot proceed" if it "rests on a substantive constitutional provision" such as the Fourteenth Amendment. *Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021); *see Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998) ("It is well-settled that a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment."). This is because political subdivisions, as "department[s] of the state," are generally subordinate to the state's aims and goals. *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923); *see Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges

or immunities under the federal constitution which it may invoke in opposition to the will of its creator."). On its face, this would appear to end the inquiry into Claims 1 and 2.

However, Plaintiffs argue a carveout. They say the general prohibition does not apply because the School Districts do not seek to vindicate their *own* rights, but rather the rights of their students. (Doc. No. 46 at 15–16.) That is, according to Plaintiffs, though political subdivisions are generally barred from bringing Fourteenth Amendment claims against a parent state for alleged violations *of their own* purported Fourteenth Amendment rights, they nevertheless *can* bring claims against a state when the claims are predicated on alleged violations of the Fourteenth Amendment rights of *individuals found within the subdivision*. (*See id.* at 13–16 (noting that two of the leading Supreme Court cases, *Trenton*, 262 U.S. 182 and *Williams*, 289 U.S. 36, each involved challenges to state laws impacting the "internal administration" of the political subdivisions, rather than the constitutional rights of their citizens).

This argument raises the natural question of whether, as framed by Plaintiffs, Claims 1 and 2, which are brought on Plaintiffs' own behalf—purportedly to vindicate the rights of their students—are indistinguishable from Claims 3 and 4, which are brought on behalf of their students to vindicate the very same rights. Indeed, Plaintiffs' carveout argument seems to walk right into this collapsing of claims, and the Court could simply recommend dismissal of Claims 1 and 2 on the basis that they are duplicative of Claims 3 and 4.

But even assuming Claims 1 and 2 are somehow distinct from Claims 3 and 4, they nevertheless fail. Plaintiffs argue that "[t]he Supreme Court has exercised jurisdiction over at least two Equal Protection suits brought by political subdivisions against their parent state": *Romer v. Evans*, 517 U.S. 620 (1996) and *Washington v. Seattle School District No. 1*, 458 U.S.

457 (1982). (Doc. No. 46 at 15–16.) According to Plaintiffs, because neither case was rejected for lack of prudential standing, it must mean this carveout exists. (*Id.* at 16.) But neither *Romer* nor *Washington* analyzed this issue, rendering the force of Plaintiffs' argument limited at best. And, unlike here, the plaintiffs in *Romer* and *Washington* were made up of political subdivisions *and* individuals, making prudential standing a minor factor in the ultimate adjudication of the cases. *See* Josh Bendor, *Municipal Constitutional Rights: A New Approach*, 31 Yale L. & Pol'y Rev. 389, 394 (2013) (noting that in *Washington*, "parents and the school district sued the state to vindicate the district's right to bus students in order to combat segregation," and in *Romer*, "individuals and municipalities sued the state to contest a state initiative removing their power to enact local antidiscrimination ordinances"); *see also id.* at 408 n.139 (noting that the United States was an intervenor plaintiff in *Washington* by the time the case reached the Supreme Court).

Moreover, The Tenth Circuit's statements on this issue leave little-to-no room for Plaintiffs' construction of *Romer* and *Washington*. For example, in *City of Hugo v. Nichols*, which was decided after *Romer* and *Washington,* the Tenth Circuit reiterated the unflinching rule that political subdivisions are barred "from advancing Fourteenth Amendment claims against their parent states or other political subdivisions of the same state." 656 F.3d 1251, 1256 (10th Cir. 2011). More recently, in *Kerr*, the Tenth Circuit emphasized "that a municipality may not bring a constitutional challenge against its creating state when the constitutional provision that supplies the basis for the complaint was written to protect individual rights[.]" 20 F.4th at 694 (quoting *Branson*, 161 F.3d at 628). And although a political subdivision *can* challenge parent state action when "the source of substantive rights [is] a federal statute directed at protecting

9

political subdivisions," it can never bring Fourteenth Amendment claims on its own behalf to vindicate *individual* rights. *Kerr*, 20 F.4th at 695 (quoting *City of Hugo*, 656 F.3d at 1257). Because Claims 1 and 2 draw on the Fourteenth Amendment and seek to protect individual rights, they are barred.

## II.   Plaintiffs' Third-Party Standing[7]

There is a "general prohibition" against a litigant "raising another person's legal rights[.]" *Allen*, 468 U.S. at 751, *abrogated on other grounds by Lexmark*, 572 U.S. 114. Indeed, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. "Without such limitations ... the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* at 500; *see RMA Ventures California v. SunAmerica Life Ins. Co.*, 576 F.3d 1070, 1073 (10th Cir. 2009) ("A well-founded prudential-standing limitation is that litigants cannot sue in federal court to enforce the rights of others.").

But claims brought on behalf of third parties are not always barred. In limited circumstances, third-party standing is permissible if a litigant can show it satisfies the requirements of Article III standing, and (1) it has a "'close' relationship" with the person who possesses the right, and (2) there is a "'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). Third-party standing is more likely

---

[7] The State Defendants do not appear to challenge the theoretical ability of political subdivisions to maintain Fourteenth Amendment claims on behalf of individuals, only that third-party standing does not exist in this particular case.

when "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Id.* (emphasis in original) (quoting *Warth*, 422 U.S. at 510). Assuming without deciding that Plaintiffs can show Article III standing here, the Court considers the closeness and hindrance questions in turn.

### A. Closeness

Defendants argue the closeness prong is not met because the School Districts' interests do not fully align with the interests of all students. This is because the policy (and in turn this suit) cuts against, for example, the interests of transgender students seeking to play on a sports team or use a gender-segregated facility that aligns with their gender identity, but not their biological sex. (Doc. No. 36 at 13–14.) According to Defendants, this conflict prevents Plaintiffs from claiming a sufficiently "close" relationship with their students.

Plaintiffs respond that there cannot be a conflict of interest because School Districts "do not seek to vindicate the rights of their transgender students." (*See* Doc. No. 46 at 10.) Instead, "Plaintiffs sue to vindicate the Equal Protection rights of their female students who are forced to play sports with boys." (Doc. No. 46 at 10.) But this statement conflicts with the Amended Complaint's description of Claims 3 and 4, which are brought on behalf of *all* students. (Doc. No. 35 at 28, 30.) It also conflicts with the policies in question, which bar transgender girls *and* boys from competing with, or sharing a locker or hotel room with, those of the same gender identity but different biological sex. (*Id.* at ¶ 43.)

During the Motion Hearing, Plaintiffs' counsel distanced himself from these conflicting statements, saying they were "unintentionally misleading," or "shorthand[ ]" for Plaintiffs' underlying sex discrimination theory. (Audio Record at 10:46:30–10:47:40.) At that time,

11

Plaintiffs' counsel re-committed to the position that the claims are brought on behalf of *all* students, explaining that Claims 3 and 4 are "brought on behalf of all girl and boy students, so that's all students effectively," and that gender identity is a "different category and status all together." (Audio Record at 10:48:10–10:48:30.) For purposes of this Motion, the Court accepts counsel's proffer that Claims 3 and 4 are brought on behalf of *all* students, and that any statements to the contrary were inadvertent.

Whether a relationship between a third party and a litigant is "close" depends on whether the "enjoyment of the [third party's] right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). The question is whether there is a "congruence of interests," not necessarily whether the plaintiff and third party are "close" in a colloquial sense. *Powers v. Ohio*, 499 U.S. 400, 414 (1991) (finding a criminal defendant had third-party standing to raise equal protections claims of jurors purportedly excluded because of their race); *see Craig v. Boren*, 429 U.S. 190, (1976) (allowing a beer vendor to assert the equal protection rights of young men in challenging a law that allowed women aged eighteen to twenty-one years old, but not men of the same ages, to purchase low-alcohol beer).

Under some circumstances, a lawyer-client relationship, *see U.S. Dep't of Labor v. Triplett*, 494 U.S. 715 (1990), or doctor-patient relationship, *see Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006), are sufficiently close to confer standing. And "teachers may have a sufficiently close relationship to their students to satisfy the first prong of the test for third-party standing." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208 (6th Cir. 2011). But a conflict of interest generally counsels against a finding of closeness. *See Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) ("[G]enuine conflicts strongly counsel against third party

12

standing."); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) (saying the litigant and third party must "have interests which are aligned"); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 33 (D.D.C. 2010) (saying courts must "deny third party standing where the litigant's 'interests in the subject of [the] suit to some extent conflict with those of the [third parties] whose rights [the litigant] purports to advance.'" (quoting *Clifton Terrace Assocs., Ltd. v. United Tech. Corp.,* 929 F.2d 714, 722 (D.C. Cir. 1991) (internal citations omitted))). Indeed, there should be "an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999); *see, e.g., Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (finding that a parent did not have standing to vindicate the rights of his daughter because the interests of the parties "[were] not parallel and, indeed, [were] potentially in conflict"), *abrogated on other grounds by Lexmark*, 572 U.S. 118.

      Here, Plaintiffs bring Claims 3 and 4 on behalf of all students, but their interests do not align with all students. Plaintiffs' policies necessarily cut against the interests of transgender students who seek to compete on teams or use facilities that align with their gender identity. The policies may also cut against the interests of students who seek inclusivity in school-sponsored activities. Plaintiffs argue that by this logic, "a school should be prohibited from challenging a racist statute that favored its white students over its black ones." (Doc. No. 46 at 10 (citing *Richmond, Va. v. Baliles*, 829 F.2d 1308, 1310 (4th Cir. 1987) (in which the Fourth Circuit allowed a school to maintain a third-party claim challenging an ineffective desegregation plan on behalf of "the white and black students of Richmond")).) But in making this argument, Plaintiffs overlook a critical distinction. In race desegregation cases, all students shared a common interest

13

in equal access to education. Even students opposed to desegregation could accept equality as a governing principle. Here, however, there is no such unifying principle underpinning the litigation.

Plaintiffs' allegations suggest that the unifying principle here, may be the avoidance of an unfair advantage. (*See* Doc. No. 35 at ¶ 51 ("Biological differences between boys and girls mean that the average boy will have a competitive advantage over the average girl and that boys would threaten to meaningfully displace girls in athletic competition if allowed to compete against them.").) But even that construction does not surface a unifying principle because it overlooks the transgender boy who seeks to compete on a boys' sports team and, by Plaintiffs' own logic, would be competitively *disadvantaged*.

Thus, the only way to construe Plaintiffs' claims is that the underlying normative principle is segregation itself. But not *all* students have a shared interest in separating students by biological sex. Indeed, the normative principle of separation by biological sex is precisely the opposite of unifying. It is—by Plaintiffs' own admission—the subject of meaningful disagreement. (*See* Doc. No. 46 at 11 (arguing there is "substantial stigma surrounding opposition to male participation in female sports and transgender ideology in general").) Thus, the analogy to race desegregation cases does not save Plaintiffs' claims.

In this case, the School Districts may be "close" to students in a colloquial sense, but their interests are not congruent with those of "all students," the group on whose behalf Plaintiffs purport to litigate. Moreover, given Plaintiffs' own admission that this issue is divisive and likely to engender opposition, it is highly likely that the interests of some students are diametrically opposed to, and thus in conflict with, Plaintiffs' position in this litigation. In other words,

14

Plaintiffs cannot act as effective advocates for "all students," the closeness prong is not met, and Plaintiffs lack prudential standing. *See Aid for Women*, 441 F.3d at 1111–12 (noting a plaintiff must show both closeness *and* hindrance to have third-party standing).

**B.     Hindrance**

Although the lack of closeness is dispositive, the Court will address Plaintiffs' hindrance arguments as well.

Courts decline to find third-party standing where there is "no indication … that the [third parties] face any obstacle in litigating their rights themselves." *Smith*, 641 F.3d at 208–09; *see also Singleton*, 428 U.S. at 116 ("Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply."). Conversely, where the obstacles or "hindrance" that a third party faces in pursuing their own litigation is meaningful (even if not insurmountable), courts will find third-party standing. *See Singleton*, 428 U.S. at 117.

Here, Plaintiffs say the negative publicity and scrutiny that a student plaintiff would suffer is significant enough to deter any student from bringing such a case. (Doc. No. 46 at 10–11.) Plaintiffs also argue the limited duration of student enrollment creates a risk of mootness before full adjudication. (*Id.* at 11–12.)

It is true that student plaintiffs in cases such as this are likely to receive negative public attention. *See Little v. Hecox*, 2025 WL 2597331, at *3 (seeking voluntary dismissal on mootness grounds in an analogous case before the Supreme Court and noting that the named college student plaintiff had come "under negative public scrutiny" that "will distract her from her schoolwork and prevent her from meeting her academic and personal goals"). But Plaintiffs do not direct the Court to any case finding that negative attention *alone* is sufficient. The cases

15

Plaintiffs rely on involve additional considerations, including privacy interests closely tied to the claims at issue. *See, e.g.*, *Singleton*, 428 U.S. at 117 (noting a third party seeking an abortion "may be chilled" by a desire to protect the privacy of her decision, and further noting the "imminent mootness" connected to pregnancy-based claims); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (involving privacy interests in marriage); *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (involving privacy interests in receiving mental health services).[8]

It is also worth noting that today's students engage with the world in ways that are meaningfully different from past generations. Through social media and online platforms, young people routinely exchange ideas, organize around shared interests, and express views on social, cultural, and civic issues. While these tools and platforms have drawn significant criticism and present well-documented risks, they also help students find and use their voices publicly, often with a certain level of confidence that comes from knowing others share their perspectives.

---

[8] Plaintiffs also cite *Exodus Refugee Immigration, Inc. v. Pence*, a non-precedential out-of-district decision involving Syrian refugees seeking to block Indiana's governor from stopping state agency distributions of federal grant funds to local refugee resettlement agencies. 165 F. Supp. 3d 718, 723 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016) (standing was not addressed by the circuit court). In *Exodus Refugee*, a resettlement agency was granted third-party standing on behalf of the Syrian refugees. Though it obviously does not bind this Court, the analysis in *Exodus Refugee* comes the closest to supporting Plaintiffs' position that negative attention on its own can support a hindrance finding. *See id.* at 732 (noting that the refugees would be injured by the "attention ... that this suit would necessarily bring"). But even that case involved additional considerations. For example, the court noted that "newly arrived refugees, escaping political or religious persecution" might be deterred if their refugee status could be jeopardized by the suit. *Id.* The considerations in *Exodus Refugee*, are not present here. *See generally League of Women Voters of Minnesota Educ. Fund v. Simon*, 2021 WL 1175234, at *10 (D. Minn. Mar. 29, 2021) (rejecting a third-party standing argument that cited *Exodus Refugee* and was predicated on "avoid[ing] the publicity and controversy of litigation," in part because the facts of *Exodus Refugee* were "[not] comparable").

A few decades ago, by contrast, students had fewer opportunities to find support beyond their schools or communities. Without the internet or social media, it was far more difficult to connect with those who shared similar views (particularly on sensitive or hotly contested issues). Today's interconnectedness helps young minds find strength in one another. Students today, far better than students in the pre-internet era, understand that even if their views are not "popular" they are not alone. This knowledge helps them speak up and speak out even when their views are not widely shared in their immediate circles. Against that backdrop, the argument that negative publicity and scrutiny will necessarily deter students from bringing a case, is less persuasive.[9]

Finally, Plaintiffs' fear of the "inevitable mootness" falls flat. (Doc. No. 46 at 11–12.) As the State Defendants point out, a student has up to thirteen years (kindergarten through twelve grade) to challenge the policies. And, even if the class of potential plaintiffs were limited to high schoolers, four years is not such a limited period. *See, e.g.*, *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (finding that high school was "not so inherently limited in duration" that an action challenging use of prayer during graduation ceremonies "will become moot before the completion of appellate review[,]" and noting that "several" similar cases had been fully litigated (internal quotation marks omitted)). *Cf. Singleton*, 428 U.S. at 117 (finding the limited window of pregnancy would result in mootness).[10]

---

[9] The Court acknowledges the double-edged sword of web interconnectedness. On the one hand, it can make people feel closer to one another notwithstanding geographic, demographic, and other barriers. On the other hand, it can amplify the spotlight and have its own deterrent effect. However, a natural self-selection process would likely surface student plaintiffs who find power and support in their online communities, rather than plaintiffs who feel deterred by the spotlight.

[10] Both of Plaintiffs' hindrance arguments are undercut by an additional fact: multiple student suits of analogous subject matter have been filed and litigated across the country in recent years. *See, e.g.*, *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (where high school athletes challenged a policy of allowing participation consistent with gender identity); *B.P.J. by*

17

In sum, though concerns about public scrutiny and the avoidance of mootness are certainly relevant considerations for a student plaintiff, neither consideration—separately or together—rise to the level of a meaningful obstacle that warrants third-party standing. *See Aid for Women*, 441 F.3d at 1113–14.

## CONCLUSION

For the foregoing reasons the Court respectfully **RECOMMENDS** that the State Defendants' Joint Motion to Dismiss the Amended Complaint (Doc. No. 36) be **GRANTED** and Plaintiffs' claims be **DISMISSED with prejudice**.[11]

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's

---

*Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024) (where a middle school student challenged a state law preventing transgender girls from playing on girls athletic teams), *cert. granted sub nom. W. Virginia v. B. P. J. by Jackson*, 222 L. Ed. 2d 1154 (July 3, 2025); *D.N. by Jessica N. v. DeSantis*, 762 F. Supp. 3d 1219, 1225 (S.D. Fla. 2024) (where a high school student challenged a state law preventing transgender girls from playing on girls athletic teams); *Slusser v. Mountain W. Conf.*, 2024 WL 4876221, at *1 (D. Colo. Nov. 25, 2024) (where college athletes challenged a policy).

[11] Because the prudential standing analysis goes to the merits of a claim, a with-prejudice dismissal is appropriate. *See VR Acquisitions*, 853 F.3d at 1149 (affirming the lower court's with-prejudice dismissal for lack of prudential standing); *Advanced Exteriors, Inc. v. Allstate Vehicle & Prop. Ins. Co.*, 2022 WL 3577260, at *6 (D. Colo. Aug. 19, 2022) ("A dismissal for lack of prudential standing is a dismissal with prejudice.").

report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 13th day of January, 2026.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge