**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-01463-JLK-MDB

SCHOOL DISTRICT 49,
MONUMENT ACADEMY,
EDUCATION REENVISIONED BOCES,
ACADEMY SCHOOL DISTRICT 20,
JAMES IRWIN CHARTER SCHOOLS,
MONTEZUMA CORTEZ SCHOOL DISTRICT,
THE CLASSICAL ACADEMY, and
COLORADO SPRINGS SCHOOL DISTRICT 11,

Plaintiffs,

v.

AUBREY SULLIVAN, Director of the Colorado Civil Rights Division, in her official capacity,
SERGIO RAUDEL CORDOVA, as member of the Colorado Civil Rights Division, in his official capacity,
GETA ASFAW, as member of the Colorado Civil Rights Division, in her official capacity,
MAYUKO FIEWEGER, as member of the Colorado Civil Rights Division, in her official capacity,
DANIEL S. WARD, as member of the Colorado Civil Rights Division, in his official capacity,
JADE ROSE KELLY, as member of the Colorado Civil Rights Division, in her official capacity,
ERIC ARTIS, as member of the Colorado Civil Rights Division, in his official capacity, and
PHILLIP WEISER, Colorado Attorney General, in his official capacity,

Defendants.

---

**ORDER OVERRULING OBJECTIONS TO AND ADOPTING RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

---

Kane, J.

In May 2025, Plaintiffs, a group of public school districts and charter schools in Colorado, brought this action against Defendants, various Colorado state officials, alleging that the Colorado Anti-Discrimination Act and its implementing regulations prohibit Plaintiffs from incorporating policies Plaintiffs deemed were necessary to "prevent sex discrimination . . . protect every student's Fourteenth Amendment Privacy Rights . . . and shield Plaintiffs from

liability under federal equal protection principles." Am. Compl. ¶ 9–11, ECF No. 35. The matter is before me on the Recommendation issued by U.S. Magistrate Judge Maritza Dominguez Braswell (ECF No. 91) (the "Recommendation"), which addressed Defendants' Joint Motion to Dismiss ("J. Mot.") (ECF No. 36).[1]

Plaintiffs adopted policies classifying sports teams according to "biological sex and maintaining sex-separate locker rooms" and related accommodations. *See* Am. Compl. ¶¶ 9, 39–50. Plaintiffs allege, however, those policies are in conflict with the Colorado Anti-Discrimination Act ("CADA") and its implementing regulations. Am. Compl. ¶ 11. According to Plaintiffs, CADA, as interpreted and applied by Defendants, prevents them from enforcing these policies without exposing themselves to "serious costs and sanctions." *Id.* ¶¶ 85, 93–94. In particular, Plaintiffs allege that the Colorado regulations implementing CADA, 3 Colo. Code Regs. § 708-1:81.9, requires them to permit students to use sex-separated facilities consistent with their gender identity and to "allow males who identify as girls to play on girls' sports teams." *Id.* ¶¶ 88, 89.

Plaintiffs allege they cannot implement CADA regulations without violating federal law. Plaintiffs contend that implementing a policy that deprives girls of athletic opportunities and benefits is a violation of the Equal Protection Clause. *Id.* ¶ 77. Plaintiffs also claim they are required to provide students with sex-segregated lockers rooms, because the "Fourteenth Amendment creates a constitutionally protected privacy interest in bodily privacy." *Id.* ¶ 78.

---

[1] Plaintiffs originally included the Colorado High School Activities Association ("CHSAA") and members of its Board of Directors as Defendants in this case. Those Defendants also filed a Motion to Dismiss (ECF No. 37) the claims against them, but they reached a settlement with Plaintiffs, and on January 13, 2026, the CHSAA Defendants were dismissed from the case, *see* Order Granting Unopposed Joint Motion to Voluntarily Dismiss with Prejudice, ECF. No. 58. Accordingly, CHSAA's Motion to Dismiss was mooted. *See* 1/14/26 Minute Order, ECF No. 61.

They further argue that because allowing boys to compete in girls' sports denies women an equal opportunity to participate in sports, they risk violating Title IX, being subjected to fines and investigations, and also losing federal funding. *Id.* ¶¶ 81, 82 (quoting Sec. 1, Exec. Order No. 14201, 90 C.F.R. § 9279 (2025)).

This is where Plaintiffs alleged dilemma arises: they can either comply with the Colorado regulations and "violate students' constitutional rights and risk federal funding loss," or comply with federal obligations and expose themselves to "state penalties including fines and athletic-program suspension." *Id.* ¶¶ 11, 81.

Plaintiffs bring four constitutional claims under 42 U.S.C. § 1983. Claims 1 and 3 allege that the challenged CADA requirements discriminate on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Claims 2 and 4 allege violations of the rights to bodily privacy and safety under the Fourteenth Amendment. *Id.* ¶¶ 110–61. Plaintiffs bring Claims 1 and 2 on their own behalf and Claims 3 and 4 on behalf of their students. *Id.* Defendants are sued solely in their official capacities. *Id.* ¶¶ 21–22, 31–33. Plaintiffs seek a declaratory judgment that CADA does not require Plaintiffs to allow boys to play on girls athletic teams nor vice versa to open private spaces to members of the opposite gender, and Plaintiffs request a permanent injunction barring its enforcement against them.

No enforcement action has been initiated against any Plaintiff. *See generally* Am. Compl. Plaintiffs instead allege that Defendants' interpretation of CADA requires them to choose between abandoning their preferred policies that they claim protect students' rights and enforce those policies which could risk future proceedings, penalties, and other sanctions. *Id.* ¶¶ 11, 96, 117. On that basis, Plaintiffs claim they have a "credible fear" of future enforcement. *Id.* ¶ 111.

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on the grounds that Plaintiffs lack Article III standing and prudential standing, and that the Eleventh Amendment shields the Attorney General from suit. J. Mot. at 2, 12–15. Magistrate Judge Dominguez Braswell's Recommendation concluded that Defendants' Motion to Dismiss should be granted because Plaintiffs lack prudential standing. She found that the doctrine preventing a political subdivision from suing its parent state barred Plaintiffs claims and that Plaintiffs have failed to establish third-party standing on behalf of their students. Recommendation at 10, 18. Plaintiffs filed timely Objections (ECF No. 64) (the "Objections") to the Recommendation, arguing that Magistrate Judge Dominguez Braswell erred in finding that they lacked prudential standing and that the political subdivision doctrine applied. *See* Objections at 4, 15.

I have reviewed the Magistrate Judge's Recommendation *de novo*, and I have considered carefully Plaintiff's Objections, Defendants' Response to the Objections ("Defs.' Resp.") (ECF No. 66), the entire case file, and the applicable law.[2] Based on my review, I conclude the Recommendation is fully supported by the record, and Plaintiffs' Objections lack merit. For the reasons set forth below, the Recommendation is ADOPTED, and Defendants' Motion to Dismiss is GRANTED.

---

[2] I have also received Plaintiffs' Notice of Supplemental Authority (ECF No. 67), citing *West Virginia v. B.P.J.*, 146 S. Ct. 2356 (2026). I have reviewed the U.S. Supreme Court's decision in *West Virginia v. B.P.J.* but give it no weight for the purposes of this Order. The Supreme Court's opinion does not alter the requirements for standing, and as such, does not impact the analysis here.

## I. LEGAL STANDARD

Federal courts are courts of limited jurisdiction. Under Article III, federal courts are limited to hearing "cases" and "controversies." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 368 (2024). Ultimately, a plaintiff must have a "personal stake" in the dispute. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Federal courts lack jurisdiction to decide the merits of a claim when a plaintiff cannot meet his burden to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992).

Article III standing is a threshold question of subject matter jurisdiction, and Rule 12(b)(1) permits the court to dismiss a complaint when it lacks subject-matter jurisdiction over the action. Fed. R. Civ. P. 12(b)(1). The party asserting federal jurisdiction bears the burden of establishing that jurisdiction exists. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017).

Alternatively, prudential standing is considered under Rule 12(b)(6). *VR Acquisitions, LLC v. Wasatch Cnty.*, 853 F.3d 1142, 1145 (10th Cir. 2017). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [her] complaint," *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012), "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[M]ere 'labels and

conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). When a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570. In reviewing a Rule 12(b)(6) motion, "all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (internal quotation marks and citation omitted).

## II. DISCUSSION

Plaintiffs assert three principal objections to the Magistrate Judge's analysis. First, they argue she erred in finding that Plaintiffs do not have third-party standing to bring their suit on behalf of their students. Objections at 5. Second, they contend the Magistrate Judge erred in applying the political subdivision doctrine. *Id.* at 15. And third, Plaintiffs assert that they possess Article III standing. *Id.* at 23. I address and reject each in turn.

### A. Article III Standing

Magistrate Judge Dominguez Braswell did not address Article III Standing. Plaintiffs raise a related objection. Because Plaintiffs' arguments regarding Article III standing set the stage for the prudential standing questions, I address Article III standing first.

There are three elements to constitutional standing. First, the plaintiff must have suffered an "injury in fact," defined as the invasion of a legally protected interest that is concrete and particularized. *Lujan*, 504 U.S. at 560. An injury "must affect the plaintiff in a personal and

individual way," *id.* at 560 n.1, and it must be "actual or imminent, not conjectural or hypothetical," *id.* at 560 (citation and quotation marks omitted). Second, there must be a causal connection between the injury and the challenged conduct—the injury cannot be "the result of the independent action of some third party not before the court." *Id.* (citation and alterations omitted). Third, there must be a likelihood that the injury will be redressed by a favorable decision on the merits. *Id*. at 561. "These requirements ensure that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quotation marks omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). When any of these necessary elements are missing, a party may move to dismiss a suit for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Plaintiffs' Amended Complaint alleges that if they implement their policies, and thereby violate CADA, not only would they be subject to "serious costs and sanctions" but Defendants could file charges of discrimination against them, causing Plaintiffs to incur litigation costs. Am. Compl. ¶¶ 93–96. Or, alternatively, should Plaintiffs follow CADA's requirements, they risk losing federal funding and violating students' rights. *Id.* ¶ 11.

With these allegations, Plaintiffs do not claim a concrete injury, but rather an asserted risk of future harm. *See Spokeo v. Robins*, 578 U.S. 330, 340 (2016) ("[A] concrete injury must be de facto; that is, it must actually exist." (quotation omitted)); *Murthy v. Missouri*, 603 U.S. 43, 72 (2024) (standing cannot rely on "speculat[ions] about the decisions of third parties") (quotation omitted). While a material risk of future harm can satisfy the concrete-harm requirement in an action for injunctive relief, the risk of harm must be sufficiently imminent and substantial. *TransUnion LLC*, 594 U.S. at 415 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983)). To bring a pre-enforcement challenge, a plaintiff must allege an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted).

The Amended Complaint's shortcomings, in this regard, lie in its internal discrepancies. Plaintiffs allege no facts establishing an imminent conflict between their policies and CADA. As pleaded, Plaintiffs argue they fear penalties under CADA, but they fail to allege they have a student who would face discrimination. Under CADA, the Act states clearly that "[i]t is . . . unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of [] sex, sexual orientation, gender identity, gender expression, [] the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." Colo. Rev. Stat. § 24-34-601(2)(a). Even viewing the Amended Complaint in the light most favorable to Plaintiffs, I cannot infer a speculated lawsuit or enforcement action would arise, if no transgender student, who would be subjected to discrimination, exists. As such, Plaintiffs' theory rests entirely on an asserted risk of future harm that remains speculative, and allegations in the Amended Complaint do not support that there is a credible threat Plaintiffs will be prosecuted under CADA. Even if Plaintiffs had adequately pled the presence of a transgender student who would likely be subjected to their bylaws, their claims nevertheless fail for the reasons discussed below.

### B. Prudential Standing

Beyond Article III's constitutional requirement, prudential standing imposes "'judicially self-imposed limits on the exercise of federal jurisdiction' that are 'founded in concern about the

proper—and properly limited—role of the courts in a democratic society.'" *Hill v. Warsewa*, 947 F.3d 1305, 1309 (10th Cir. 2020) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997)); *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979) (Prudential barriers seek "to limit access to the federal courts to those litigants best suited to assert a particular claim."). These limits exist "'to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim.'" *Paoloni v. Goldstein*, 200 F.R.D. 644, 647 (D. Colo. 2001) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985)).

Defendants raised two prudential standing arguments. First, they argued that Claims 1 and 2 must be dismissed under the political subdivision doctrine. Mot. at 12–13. Second, for Claims 3 and 4, they contend Plaintiffs have failed to establish third-party standing. *Id.* at 13. I agree with both arguments.

**a. Political Subdivision Doctrine**

"It is well-settled that a political subdivision may not bring a federal suit against its parent state based on rights secured through the Fourteenth Amendment." *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998); *see also City of Hugo v. Nichols*, 656 F.3d 1251, 1257–61 (10th Cir. 2011) (observing that a political subdivision has long been understood to be barred from suing its parent state under a "substantive constitutional provision"); *Kerr v. Polis*, 20 F.4th 686, 696 (10th Cir. 2021).

The rule rests on the principle that political subdivisions are "department[s] of the state," and the state has total autonomy to "withhold, grant, or withdraw" the subdivisions powers and privileges. *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923); *Housing Auth. of Kaw Tribe of*

*Indians v. City of Ponca City*, 952 F.2d 1183, 1188–89 (10th Cir. 1991) (barring political subdivisions from advancing Fourteenth Amendment claims against their parent states); *Colorado State Bd. of Educ. v. Adams Cnty. Sch. Dist. 14*, 537 P.3d 1 (Colo. 2023) (dismissing two claims against the State Board of Education because "[p]olitical subdivisions do not have any rights under the federal constitution.").

In *Kerr v. Polis*, the Tenth Circuit prescribed a two-step inquiry for determining whether a political subdivision has a cause of action against its parent state. 20 F.4th at 696. First, courts must assess whether the political subdivision's cause of action rests on a substantive constitutional provision; if so, the claim cannot proceed. *Id.* Second, if the political subdivision sues under a federal statute, courts must consider whether Congress specifically intended to create a cause of action for political subdivisions. *Id.* Magistrate Judge Dominguez Braswell held the doctrine "end[ed] the inquiry into Claims 1 and 2," because Plaintiffs are political subdivisions attempting to bring a claim under the Fourteenth Amendment, a substantive constitutional provision. *See* Recommendation at 8. Plaintiffs attempt to bring a claim under the Fourteenth Amendment against their parent state, which is barred under the doctrine.

Plaintiffs' objections to Magistrate Judge Dominguez Braswell's conclusions regarding Claims 1 and 2 rely on three arguments. First, Plaintiffs contend that *Romer v. Evans*, 517 U.S. 620 (1996) and *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982), establish an exception to the rule barring political subdivisions from suing their parent states. Second, Plaintiffs assert that Claims 1 and 2 are, like Claims 3 and 4, brought on behalf of their students rather than themselves. And, lastly, Plaintiffs maintain that charter schools are not political actors subject to the doctrine. Objections at 15–23. Each argument fails for the reasons discussed below.

Plaintiffs contend that *Romer* and *Seattle School Dist. No. 1* control, reasoning that because neither suit was dismissed for lack of prudential standing, an exception to the doctrine must exist. Objections at 15–19. As Magistrate Judge Dominguez Braswell correctly observed, however, "neither *Romer* nor *Seattle School Dist. No. 1* analyzed this issue." Recommendation at 9. A court's silence on a question not presented establishes no rule. *United States v. Turrieta*, 875 F.3d 1340, 1346 (10th Cir. 2017) ("When parties do not raise or consider an issue and the court does not address it, 'the case is not a binding precedent on [that] point'") (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952)). Moreover, the plaintiffs in both cases included individuals *alongside* political subdivisions, further distinguishing those cases from this action. As long as one plaintiff has standing, the case may proceed. *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Therefore, it is not necessary that the political subdivisions had standing at all.

Second, Plaintiffs attempt to differentiate claims because they "do not purport to invoke their own 'privileges or immunities,' and because charter schools are not political actors. Objections at 15, 19. The Amended Complaint forecloses this characterization. Claims 3 and 4 are expressly brought "on Behalf of District 49 Students." Amended Complaint at 28, 30. Claims 1 and 2 contain no comparable designation. Magistrate Judge Dominguez Braswell was therefore correct in recognizing that, Plaintiffs' reading would make Claims 1 and 2 "indistinguishable from Claims 3 and 4, which are brought on behalf of their students." Recommendation at 8. Plaintiffs cannot recharacterize their own claims in objections to avoid the consequence of how they pleaded them.

Lastly, Plaintiffs argue that charter schools are not political actors and thus fall outside the doctrine. This argument is waived. Plaintiffs defended against the application of the political subdivision doctrine before Magistrate Judge Dominguez Braswell, but they did not argue there

that charter schools are categorically excluded from it. "Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001) ("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived.").[3]

In any event, the argument fails on the merits. When determining whether charter schools are political subdivisions, courts have considered a state's "statutory and case law, as well as the substantive control" that state exerts over the charter school. *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776, 777 (9th Cir. 2011); *Dolores Huerta Preparatory High v. Colorado State Bd. of Educ.*, 215 P.3d 1229, 1233 (Colo. App. 2009). After consideration of statutory and case law, I find that charter schools are political subdivisions of the state.

Colorado law itself treats charter schools as public schools. Colo. Rev. Stat. § 22-30.5-104.9(2)(a) states that "[a] charter school has the same public status as a public school" and for purposes of campaign contributions, charter schools are treated "as a political subdivision of the state," *id.* § 22-30.5-104.9(6).

---

[3] I recognize that distinguishing a new theory from a refinement of an existing one can involve "rather fine hair-splitting," and that courts in this circuit have asked whether "[t]he main issues at the heart of the motion . . . were presented earlier." *Alto Eldorado Partners v. City of Santa Fe*, No. CIV. 08-0175 JB/ACT, 2009 WL 1312856, at *16 (D.N.M. Mar. 11, 2009). Plaintiffs' argument here falls on the waived side of that line. Plaintiffs do not merely cite new authority in support of a position previously advanced; they advance a categorically new legal theory—that charter schools are excluded from the doctrine altogether—that would have required the Magistrate Judge to undertake an analysis she was never asked to conduct. *See Schulz v. Storylines Glob. Inc.*, No. 24-cv-00055-JNP-JCB, 2025 WL 2691920, at *4 (D. Utah Sept. 22, 2025) (dismissing a claim after the plaintiff argued new standards for the first time in objections to a magistrate judge's recommendation which differed from standards of interpretation that were originally argued).

Colorado charter schools also appear to be, to a degree, under the control of the State. Charter schools are created and operated under the Colorado Charter Schools Act. *Id.* § 22-30.5-101. Charter schools are expressly characterized as "public school[s]" that "derive[] [their] support, in whole or in part, from moneys raised by a general state, county, or district tax." *See id.* § 22-1-101. Moreover, charter schools are "subject to annual review by" the Colorado Department of Education. *Id.* § 22-30.5-104.

Additionally, state law weighs against Plaintiffs' argument. The Colorado Court of Appeals has explicitly held that the political-subdivision doctrine bars lawsuits from charter schools against the State. *See Dolores Huerta Preparatory High*, 215 P.3d at 1233. As the statutory and case law recognize charter schools as political subdivisions, they are barred from invoking the protections of the Fourteenth Amendment under the political subdivision doctrine.

**b. Third Party Standing**

Under the doctrine of prudential standing,[4] there is also a general prohibition on a litigant's raising another person's legal rights. *Id.* at 1309 (quoting *Lexmark Int'l, Inc. v. Static*

[4] A panel of the Tenth Circuit has indicated that third-party standing should be analyzed as an element of prudential standing. *See Hill*, 947 F.3d at 1308. I question this hard-line rule. In *Warth v. Seldin*, the Supreme Court explained that part of the Article III inquiry is whether the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. 422 U.S. at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992) (explaining, while articulating the standard for Article III standing, that "the injury must affect the plaintiff in a personal and individual way"). *Warth* added that "[a]part from that minimum constitutional mandate" and "even when the plaintiff has alleged sufficient injury sufficient to meet the 'case or controversy' requirement, [the] Court has held that the plaintiff generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." 422 U.S. at 499. That distinction suggests that third-party standing should, therefore, be considered first under Article III and then under the doctrine of prudential standing.

*Control Components, Inc.*, 572 U.S. 118, 126 (2014)). But in limited circumstances, exceptions to this prohibition have been found permissible. Those exceptions occur when, along with satisfying the requirements of Article III standing, a party shows: (1) a close relationship with the person who possesses the right and (2) a hindrance to the possessor's ability to protect his own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

Plaintiffs rely third-party standing to bring their third and fourth claims. Plaintiffs assert those claims on "behalf of District 49 Students." Am. Compl. at 28, 30. Claims 3 and 4 allege CADA discriminates against female students thereby denying them Equal Protection and violates

---

The Supreme Court has acutely noted this distinction, even if it has not ultimately decided the matter. *See Lexmark Intern, Inc.*, 572 U.S. at 127 n.3 ("[W]e have observed that third-party standing is closely related to the question whether a person in the litigant's position will have a right of action on the claim . . . but most of our cases have not framed the inquiry that way.") (quotation omitted). Similar claims of representational or associational standing are at least partly analyzed under the Article III requirements. *See United Food & Com. Workers*, 517 U.S. at 554. And, recently, in *FDA v. All. For Hippocratic Med.*, the U.S. Supreme Court considered whether doctors had standing to bring claims on behalf of their patients under the Article III standard. 602 U.S. at 378. These cases suggest that questions concerning a litigant's ability to invoke the rights or interests of others cannot be divorced entirely from Article III's constitutional requirements.

Professor S. Todd Brown advances a similar understanding. S. Todd Brown, *The Story of Prudential Standing*, 42 HASTINGS CONST. L.Q. 95, 128 (2014). Although the third-party principle has been identified as "discretionary," Brown explains that it was nevertheless guided by "constitutional concerns." *Id.* at 130. The premise is that parties will be the best proponents of their own right, thereby ensuring the issues will be concrete and sharply presented while avoiding "unnecessary pronouncement on constitutional issues." *Id.* at 130. Against that backdrop, Brown characterizes "the third-party rights inquiry" as "a reformulation of Article III standing principles." *Id.* at 131.

Justice Thomas has advocated an even more explicit version of this approach. In *June Medical Services L.L.C. v. Russo*, he observed that "the Court's previous statements on the rule against third-party standing have long suggested that the 'proper place' for that rule is in Article III's case-or-controversy requirement." 591 U.S. 299, 362 (2020) (Thomas, J., dissenting). Thus, there is substantial doctrinal and scholarly support for viewing the inquiry as at least partly rooted in Article III's constitutional requirements.

Nevertheless, Defendants in this case framed their challenge as one regarding prudential standing, Plaintiffs responded accordingly, and Magistrate Judge Dominguez Braswell assessed their arguments as presented. I follow suit.

all students' Fourteenth Amendment right to bodily privacy. Am. Compl. at 29–30. Plaintiffs contend they have a "close relationship with their students" and are "well-situated to vindicate their constitutional rights." *Id.* ¶¶ 146, 157. Magistrate Judge Dominguez Braswell found Plaintiffs could not establish third-party standing because the third-party students did not have the requisite close relationship and there was no hinderance preventing the third-party students from bringing suit. Plaintiffs argue that they have satisfied both requirements for third-party standing, because there is no apparent conflict between the students they represent and there is negative publicity and scrutiny that hinders students from bringing individual suit over these issues. *See* Objections at 4–14. I find Magistrate Judge Dominguez Braswell's conclusions are correct.

**1. Closeness**

The closeness requirement for third party standing is met where the "relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Singleton v. Wulff*, 428 U.S. 106, 115 (1976). Even an otherwise close relationship will not support third-party standing where there are, "conflicts of interest [] among the members of an association or between an association and its members." *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir. 1988); *see, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (holding that a father lacked third-party standing to assert the rights of his child because the interests of the parent and this child are not parallel and were potentially in conflict).

The Amended Complaint features obvious conflicts of interest among the students Plaintiffs seek to represent. Magistrate Judge Dominguez Braswell correctly observed that

Plaintiffs' theory under Claims 3 and 4 is internally inconsistent. Recommendation at 13. Plaintiffs allege these claims are brought on behalf of *all* students. Am. Compl. at 28, 30. However the policies Plaintiffs seek to enforce operate against the interests of transgender students who wish to compete on teams or use facilities consistent with their gender identity and equally against the interests of students who favor inclusive participation in school-sponsored activities. Recommendation at 13. Plaintiffs cannot simultaneously represent students whose rights their policies would vindicate and students whose rights those same policies would burden. The conflict of interest present in this case warrants the rejection of third-party standing.

Plaintiffs' argument that Magistrate Judge Dominguez Braswell incorrectly assumed Plaintiffs enroll transgender students, or those who share the goals of transgender students, is unpersuasive. First, Claims 3 and 4 fail to establish third-party standing independent of the presence of any particular student, as Plaintiffs have not alleged that all, or substantially all, of their students share an interest in sex-based separation, and I refuse to read such an allegation into the Amended Complaint. I need not indulge the inference that no student within Plaintiffs' districts or schools is transgender nor that no student supports the equal treatment of transgender students.[5]

Second, Magistrate Judge Dominguez Braswell was correct to make the contrary inference that Plaintiffs would have students with opposing interests. Although I must accept well-pleaded factual allegations as true and draw reasonable inferences in Plaintiffs' favor, that obligation does not require me to assess the pleadings in a contextual vacuum, nor does it extend

[5] Although Plaintiffs fail to allege the presence of any particular student who would be subject to the challenged policies for purposes of Article III standing, that omission does not undermine the inference drawn here. The presence of students whose interests algin with transgender rights is sufficient to establish the potential conflict of interest.

to "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir.1994) (Courts are "not bound by conclusory allegations, unwarranted inferences or legal conclusions."). The reasonable conclusion, from the facts alleged, is that the students attending Plaintiffs' schools represent an average mix of young people with varying ideas, interests, and principles.[6] There is no reason to assume the conflict Plaintiffs face would be confined to a single "hypothetical dissenting student." Objections at 10. The apparent conflicts that would exist with the interests of some students "diametrically opposed" to the interests of others weigh decisively against a finding of closeness. Recommendation at 14.

The authorities on which Plaintiffs rely do not support a contrary conclusion. Plaintiffs cite three cases to support their contention that a "representative organization" is "entitled to assert the litigation interests of their constituents when they bring third-party claims to vindicate their constituents' rights." Objections at 11 (citing *Runyon v. McCrary*, 427 U.S. 160 (1976); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 529 (1925); *Washington v. Seattle School District No. 1*, 458 U.S. 457, 457 (1982)). The cases Plaintiffs cite, however, are distinguishable from the case at hand and therefore unpersuasive.

[6] Schools differ from issue-focused organizations for obvious respect: their members do not necessarily share a common set of interests. As the Supreme Court has explained, "[t]he only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." *International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, 477 U.S. 274 (1986) (citing *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 187 (1951) (Jackson, J., concurring)). That rationale carries less force in the school context. Unlike an issue-focused organization formed around shared objectives or beliefs, a school naturally encompasses students whose views, values, and interests may naturally differ, and, at times, conflict.

In *Runyon v. McCrary*, two children along with their parents brought claims against private schools alleging violations of 42 U.S.C. § 1983. 427 U.S. at 160. The private schools were defendants; they were not, as Plaintiffs claim, "bringing a claim." *Runyon*, 427 U.S. at 160. This seemingly simple distinction is crucial, as it is the plaintiff that must allege facts that demonstrate standing. *Spokeo*, 578 U.S. at 338. Plaintiffs' note that the schools were allowed to assert arguments on behalf of their partons. *See Runyon*, 427 U.S. at 175 n.13 ("It is clear that the schools have standing to assert these arguments on behalf of their patrons."). This, however, does not overcome the hurdle of standing. I see no indication that this footnote, that does not mention Article III, stands for the proposition that a representative organization is automatically entitled to the litigation interest of some of their constituents, without having to meet establish standing requirements.

*Pierce v. Society of the Sisters* is likewise distinguishable. In 1922, Oregon voters passed the Compulsory Education Act. 268 U.S. at 530. The law mandated that every parent or guardian had to send children in a set age range to public schools. *Id.* at 530 n.1. Two private schools sued to enjoin enforcement. *Id.* at 531. Notably, the students and parents of the school, who were also plaintiffs, seemingly faced no conflict of interest comparable to the one present here. *Id.* at 530. "The challenged act, . . . requires *every* parent, guardian, or other person having control or charge or custody of *a child between 8 and 16 years* to send him 'to a public school for the period of time a public school shall be held during the current year.'") *Id.* at 530 n.1 (emphasis added). There was no apparent conflict between students in *Pierce*, because the Oregon law affected all parents and children between eight and sixteen years equally. The case is also distinguishable as the schools alleged their own injuries, alongside those of the children and parents. Society of Sisters was an Oregon corporation that "care[d] for orphans, educate[d] and instruct[ed]the

youth, [and] establish[ed] and maintain[ed] academies or schools. *Id.* at 531. Hill Military Academy, another plaintiff, was a private corporation that operated and conducted "an elementary, college preparatory, and military training school for boys between the ages of 5 and 21 years." *Id.* at 533. Hill Military Academy's business was "being destroyed and its property depreciated [because] parents and guardians [were] refusing to make contracts." *Id.* Each of these plaintiffs could establish their own injury in fact as withdrawal from schools of children had already occurred, and there was injury to the corporation's business property. This is distinguishable from here, where Plaintiffs are solely relying on third-party standing for Claims 3 and 4. Moreover, as *Pierce* does not ever discuss third-party rights, it is unpersuasive. *See Singleton*, 428 U.S. at 129 n.6 (Powell, L., concurring) ("*Pierce* is of little or no precedential value since the Court did not address or even mention the issue of third-party rights in that case").

Similarly, *Washington v. Seattle School District No. 1* is unpersuasive. There, school districts brought suit to challenge a state law that directly conflicted with their programs of busing for desegregation. 458 U.S. at 457. The exact allegations in *Seattle School District No. 1* are not presented by Plaintiffs here. Further, the Supreme Court does not mention or discuss third-party standing. For that reason, I cannot determine on what basis standing was granted. The school districts very well may have standing based on injury, as their plan was in direct conflict with the state initiative. *See id.* Thus *Seattle School Dist. No. 1* is not instructive here for Claims 3 and 4 which rely on third-party standing. Plaintiffs' cited cases, neither collectively nor separately, stand for the principle that a school may bring suit to vindicate the rights of one group of students at the expense of another.

**2. Hindrance**

Even where a close relationship exists, there must be some indication that the injured parties may be unable to litigate their rights themselves. *Aid for Women v. Foulston*, 441 F.3d 1101, 1113 (10th Cir. 2006). The injured party must face an obstacle that is meaningful. *See Singleton*, 428 U.S. at 117. Courts have previously recognized both the risk of imminent mootness and the prospect that litigation itself may expose the very interest a party seeks to protect as sufficient obstacles to the right-holder's ability to sue. *Aid for Women*, 441 F.3d at 1113 (citing *Singleton*, 428 U.S. at 117).

Plaintiffs cite two hindrances to individual students: "[N]egative publicity and scrutiny that a student plaintiff would suffer" from bringing their own suit, and the risk of "mootness due to the limited duration of student enrollment." Resp. to Mot. at 11–12, ECF No. 46. Magistrate Judge Dominguez Braswell found there was no hinderance, because negative attention, alone, is insufficient, and that four years is not such a limited time that the case would inevitably be moot. Recommendation at 15, 17.

Plaintiffs object, arguing that the two hinderances they cited should constitute a complete hindrance, while, again, relying on inapposite authority. I begin by addressing their first argument—that students risk threats to their privacy and social stigma by bringing suits. Objections at 12. Plaintiffs cite oral arguments from *Little v. Hecox*, for the proposition that "students face significant threats to privacy and social stigma." Objections at 12 (citing Transcript of Oral Argument at 118, *Little v. Hecox*, No. 24-38 (U.S. Jan 13, 2026)). Not only does an oral argument transcript have no precedential weight, but the students facing the stigma in *Little* were transgender students themselves, not students who would challenge policies

permitting participation consistent with gender identity.[7] Plaintiffs' reasoning would permit any party whose preferred policy is contested to claim the mantle of the burdened group, which is not what the hindrance inquiry contemplates. Alternatively, students who wish to bring suits challenging the validity of policies similar to the ones challenged here are not without options for protection from public scrutiny. Those students can request to sue pseudonymously or bring suits through their parents if they are under eighteen.

The remaining authorities Plaintiffs cite are equally unavailing, as they dealt with third parties who were politically vulnerable and whose privacy interests would necessarily have been compromised by self-advocacy. *See, e.g.*, *Singleton*, 428 U.S. at 117 (involving third-party plaintiffs who attempted to represent individuals who *sought* abortions); *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (involving privacy interests in *receiving* mental health services). Plaintiffs identify no comparable interest here. They do not explain the potential stigma or repercussions their students would face upon bringing Claims 3 and 4, nor do they explain how requiring students to advocate on their own behalf would compromise the equal-protection and bodily-privacy rights they seek to vindicate.

Additionally, the volume of comparable litigation nationwide undermines Plaintiffs' contention that students are hindered from bringing similar claims. As Magistrate Judge Dominguez Braswell observed, parents and students have brought numerous lawsuits challenging policies similar to the ones that are at-issue here. Recommendation at 17 n.10; *see,*

---

[7] The social stigma faced by transgender students has been well documented. One "study found that transgender and questioning students face a higher prevalence of experiencing violence, poor mental health, suicidal thoughts and behaviors, and unstable housing and a lower prevalence of school connectedness compared with their cisgender peers." Suarez NA, Trujillo L, McKinnon II, et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students—Youth Risk Behavior Survey*, 73 MMWR (2023).

*e.g., Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3rd Cir. 2018) (non-transgender students, filing pseudonymously, and some proceeding through their parents, challenged a policy allowing transgender students to use restrooms and locker rooms consistent with gender identities); *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) (parents and students challenged an Oregon school district's Student Safety Plan permitting a transgender student to use bathrooms, locker rooms, and showers corresponding with his gender identity); *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34 (2nd Cir. 2023) (non-transgender high school athletes challenged a policy that allowed participation consistent with one's gender identity); *D.N. by Jessica N. v. DeSantis*, 762 F. Supp. 3d 1219, 1225 (S.D. Fla. 2024) (transgender high school student challenged state law which required teams to be designated based on students' sex assigned at birth and prevented transgender girls from playing on girls athletic teams).

Plaintiffs' alternative contention is that mootness constitutes a hindrance, and that argument fails for the same reason. It is apparent from the cases cited above, as Magistrate Judge Dominguez Braswell noted, that "multiple student suits of analogous subject matter have been filed and litigated across the country in recent years." Recommendation at 17 n.10. Several of those actions proceeded to full resolution, demonstrating that such claims are not inevitably mooted by the passage of time.

Plaintiffs also overstate *Craig v. Bonsen*, 429 U.S. 190 (1976). Plaintiffs claim *Craig* stands for the principle that three years is enough to support third party standing. Objections at 14. There the Supreme Court permitted a vendor, who possessed an independent Article III injury, to assert the rights of young male customers after the other plaintiff's claim became moot when he aged out of the challenged three-year restriction. *Id.* at 192–94. The Court reasoned that

requiring a new direct challenge would foster repetitive litigation without serving any functional purpose. *Id.* Plaintiffs here, by contrast, possess no independent Article III injury, nor is there a similar risk of repetitive litigation.

For these reasons, I find Plaintiffs lack third-party standing to bring Claims 3 and 4.

**CONCLUSION**

Accordingly, IT IS ORDERED:

1. Magistrate Judge Dominguez Braswell's Recommendation on Defendant's Motion to Dismiss (ECF No. 60), issued January 13, 2026, is ADOPTED *in toto*;

2. Plaintiffs' Objections to the Magistrate Judge's Recommendation (ECF No. 64) are OVERRULED;

3. Defendant's Motion to Dismiss Amended Complaint (ECF No. 36) is GRANTED;

4. The Clerk of the Court shall enter judgment in favor of Defendants and shall close this case; and

5. Plaintiff's Motion for Leave to File Sur-Reply Regarding Statements at Oral Arguments (ECF No. 59) is DENIED as MOOT following this order.

DATED this 26th day of August, 2026.

John L. Kane
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE